UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Dawn Williams, | ) | Civil Action No. 5:23-5942-JD-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Martin O'Malley, Commissioner of Social | ) | |
| Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

This appeal from a denial of social security benefits is before the court for a Report and
Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought
this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the
Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance
Benefits ("DIB"), Supplemental Security Income ("SSI"), and Widow's Insurance Benefits
pursuant to the Social Security Act ("the Act"). The issues before the court are whether the decision
is supported by substantial evidence, and whether the Commissioner's decision contains an error of
law. For the reasons that follow, the undersigned recommends that the Commissioner's decision be
reversed and remanded for further administrative action.

I.    Relevant Background

    A.    Procedural History

Plaintiff applied for DIB and SSI alleging a disability onset date of April 20, 2017.[2] Tr. 415-
21. Her applications were denied on initial review, Tr. 139-40, and upon reconsideration, Tr. 192-

---

[1] Martin O'Malley was confirmed as Social Security Commissioner on December 20, 2023.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Martin
O'Malley for Kilolo Kijakazi as Defendant in this action.

93. Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). Tr. 232-33. Plaintiff also filed an application for disability widow's benefits.[3] Tr. 433-41. Plaintiff appeared with her counsel for a hearing before an ALJ on January 5, 2023. Tr. 55-116. Vocational Expert ("VE") Jessica Coles also testified at the hearing. The ALJ issued a partially unfavorable decision on May 8, 2023, finding Plaintiff was not disabled prior to October 15, 2022, but she became disabled on that date and continued to be disabled through the date of the decision. Tr. 14-36. On June 30, 2023, Plaintiff requested review of the unfavorable decision. Tr. 412-13. The Appeals Council denied that request on September 22, 2023, making the ALJ's decision the final decision of the Commissioner. Tr. 1-5. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on November 20, 2023. ECF No. 1.

      B.      Plaintiff's Background

Plaintiff was born in October 1967, and was 49 years old as of her alleged onset date of April 20, 2017. Tr. 462. In her February 13, 2020 Disability Report-Adult form, Plaintiff indicated that she completed the 12th grade, did not attend special education classes, and did not complete any specialized job training, trade or vocational school. Tr. 456. Plaintiff listed her past relevant work ("PRW") as retail automotive service advisor and restaurant chief cook. *Id.* She indicated she stopped working on March 17, 2014, because of her medical condition of PTSD. Tr. 455. Plaintiff indicated that she was 5'5" tall and weighed 237 pounds. *Id.* She noted that her condition did not cause her pain or other symptoms. *Id.*

      C.      The Administrative Hearing

---

[2] The record does not contain a copy of Plaintiff's application for SSI. However, based on the Disability Determinations, Plaintiff protectively filed applications for DIB and SSI on January 27, 2020. Tr. 139-40.

[3] The Application Summary is dated February 16, 2023. Tr. 435-36. However, the ALJ refers to an application for disabled widow's benefits dated September 3, 2021. Tr. 17.

On January 5, 2023, Plaintiff, accompanied by her counsel, appeared in-person for the administrative hearing in Charleston, South Carolina before ALJ Richard LaFata. Tr. 55. VE Jessica Coles also appeared and testified. *Id.*

1.     Plaintiff's Testimony

In response to questions from the ALJ, Plaintiff verified her name and date of birth, and testified that she was 55 years old, graduated from high school taking regular classes, and after high school served two years in the U.S. Army. Tr. 62. Plaintiff confirmed that she left the Army under a general honorable discharge and not a medical discharge. *Id.* Plaintiff testified that she lives alone in an apartment, she has a driver's license, and she does drive. Tr. 63. Plaintiff indicated that she has not received workers' compensation or unemployment benefits, but she currently receives EBT.[4] Tr. 64. Plaintiff testified that she is ambidextrous, 5'5.5" tall, and weighs 248 pounds. *Id.* Plaintiff confirmed this was her average weight. *Id.* Plaintiff testified that she "used to use marijuana" and had last taken a "puff" one day in December. Tr. 65. Plaintiff stated that she used marijuana to help with her suicidal thoughts and anxiety in 2014 when she could not get the medication she needed for PTSD. Tr. 66. Plaintiff confirmed that she did not chew or smoke tobacco and she "gave that up" in 2014. Tr. 67. Plaintiff stated that she has not done any volunteer work, and she has not applied for work anywhere since April 20, 2017 "because all the jobs have qualifications [she] can't do." *Id.* Plaintiff testified that she attempted to learn coding from her mother, but she "couldn't grasp it." Tr. 68. Plaintiff stated that she looked for jobs online, but she did not apply for anything because the qualifications were more than she had as a laborer. *Id.* The ALJ noted that Plaintiff worked as an auto services advisor and Plaintiff stated that she "had some very heavy lifting with that job too." *Id.* Plaintiff confirmed that she had to get updates and stay up to date on repairs and

---

[4] Electronic Benefits Transfer (EBT) is an electronic system that allows a Supplemental Nutrition Assistance Program (SNAP) participant to pay for food using SNAP benefits. *See* https://www.fns.usda.gov/snap/ebt (last visited Oct. 8, 2024).

recalls. Tr. 69. Plaintiff testified that she has not worked anywhere since April 2017. *Id.* When asked about "side jobs" Plaintiff stated that she likes to braid hair but "can't even do that anymore." *Id.* Plaintiff stated that she last braided hair in November 2022, but her shoulder prevents her from braiding hair extensions. *Id.* The ALJ asked Plaintiff if she had an injury to her shoulder or had been diagnosed with a shoulder condition and Plaintiff stated that she did not have the insurance to have the procedure done that she needs. Tr. 70. Plaintiff's attorney explained that Plaintiff recently got into Access Health[5] which would provide her with more resources to have more tests and scans completed. *Id.* Counsel indicated there was a notation in a consultative examination of decreased range of motion disorder. Tr. 70-71. The ALJ resumed questioning of Plaintiff and asked how much she was paid for hair braiding in 2020 and Plaintiff testified that she was paid $20 by one person. Tr. 71. Plaintiff stated that she did not do any braiding in 2021, and in 2022 she did hair braiding or hair extensions twice. *Id.* Plaintiff stated that she reads on a regular basis as a hobby. Tr. 72. Plaintiff testified that her functioning was getting worse in the last year—most noticeably the numbness in her leg and back, and her headaches. Tr. 72-73. Plaintiff testified that since her 2017 decision[6] she felt her mental health functional capability is worse, and it has been a gradual process. Tr. 73. Plaintiff testified that the pain radiating from her back to her leg is the "worst part" and she cannot stand for longer than five minutes. Tr. 74. Plaintiff testified that on a scale of zero to ten her back pain is "about a six" or a "seven on bad days." *Id.* Plaintiff testified that she has one or two days a week that would rate a seven up to a ten. *Id.* Plaintiff testified that she could stand for about five minutes before having to sit or change positions. Tr. 74-75. Plaintiff stated that she can walk a little more than she can stand. Tr. 75. Plaintiff stated that after standing for about five minutes she

---

[5] Access Health SC is a statewide effort that encourages and supports the creations of community-based networks of a broad range of healthcare providers and other health-related resources working in collaboration to provide uninsured South Carolinians a coordinated approach to care. *See* https://scha.org/initiatives/healthier-communities/accesshealth/ (last visited Oct. 8, 2024).
[6] The record contains an April 19, 2017 decision by ALJ Christine Guard denying Plaintiff's 2014 claims for DIB and SSI. Tr. 195-207.

will sit down, and then if it does not get better, she will "take a muscle relaxer or two and lay down." *Id.* Plaintiff stated that if her leg is "just numb, if it hasn't started hurting yet, usually it can be about 15 minutes" before she can get stand up again. Tr. 75-76. Plaintiff confirmed that her back and leg symptoms affect her ability to walk, and she estimated she can walk for ten minutes before her "lower back starts getting heavy." Tr. 76. Plaintiff confirmed that she can walk for about ten minutes and then she has to rest for 30 minutes. *Id.* Plaintiff testified that she tried riding a bike, but that hurt too. *Id.* Plaintiff stated that her back and leg issues affect her ability to sit only if she sits in the same position for a long time. Tr. 77. Plaintiff testified that if she sits for "more than an hour or two it seems like [her] back will lock and [she has] to lay down." *Id.* Plaintiff stated that if she is at home she will have to lie down in her bed or if she is somewhere else, she will lie down on the couch. *Id.* Plaintiff stated that she used to be able to lift a lot, but she no longer can. *Id.* Plaintiff testified that she could probably lift ten pounds infrequently, but she did not know how much she could lift and carry on a regular basis. Tr. 78. Plaintiff testified that she was first diagnosed with headaches when she had an aneurysm in 2015; Plaintiff stated that her headaches are worse and more frequent. *Id.* Plaintiff testified that her headaches have increased in frequency over the last year. She stated that she used to keep documentation, but she stopped. *Id.* Plaintiff testified that her pains are "not in the same spot" and "are moving." Tr. 79. Plaintiff stated that her headaches typically last "two hours, maybe longer" and she takes muscle relaxers that "help[] a little but not much" and just put her to sleep. *Id.* Plaintiff stated that she has headaches three days a week on average. Tr. 80. Plaintiff rated her headache pain at "about a seven." *Id.* Plaintiff stated that the symptoms with her right shoulder have "always been going on and it just got worse recently in the last year or so." *Id.* Plaintiff stated that when her shoulder hurts the pain is a ten. Tr. 81. Plaintiff stated that she has not had an MRI but when she has her upcoming appointment with her PCP they will schedule her for CT scans. *Id.* Plaintiff stated that she never had studies done because she did

not have insurance. *Id.* Plaintiff confirmed that she would have to limit how she moves her shoulder or reaches based on the pain she is experiencing. Tr. 82.

Plaintiff's attorney asked her what mental health limitations she had that affect her ability to work. Tr. 83. Plaintiff testified that she did not know how to explain it, but she had a "feeling of worthlessness and hopelessness all the time." *Id.* Plaintiff stated that she "can't grasp things" or "catch onto things like [she] used to." *Id.* Plaintiff confirmed that she has days when she has trouble getting out of bed, and days when she just cries. *Id.* Plaintiff stated that happens once a week. *Id.* Plaintiff testified that when she is confronted with situations, like appearing for the hearing, she feels anxious. *Id.* Plaintiff stated that she does not take medication; she was prescribed medication, but she could not get it because she did not have insurance. Tr. 84. Plaintiff testified that someone at Access Health put her in contact with a company so that she can get her prescriptions for free, and she will turn in the paperwork that day. *Id.* Plaintiff indicated that she first got covered by Access Health the previous day or the day before. She said there were issues with communication and trying to get an appointment over the past few months. *Id.* Plaintiff testified that she is scheduled to see her doctor on February 14 and at that time she will be assessed for her physical and mental health treatment. Tr. 85. Plaintiff testified that she tries not to interact with people, and she has one friend that she talks to infrequently, but who she was able to call and have her accompany Plaintiff to the hearing. Tr. 85-86. Plaintiff testified that she gets along with her mother and father who are her "only family." Tr. 86. Plaintiff testified that she sometimes has problems with grocery shopping, and she goes once a month. *Id.* Plaintiff confirmed that she uses her phone and Facebook. Tr. 86-87.

When asked how she was affected by her aneurysm Plaintiff testified:

> I didn't sleep for years. I didn't sleep correctly because I always had a fear of waking up with the headache again. It was the worst I ever had in my life. When I woke up to go to work and I had the aneurysm, I don't know. Just after that, it just ruined my life I think. It ruined my whole life because I was doing good. I was doing really good.

Tr. 87. Plaintiff testified that she used to be a very social person, but the thought of being around other people makes her "cringe" because she feels like a burden. Tr. 88. Plaintiff stated that once or twice a week she has "flashbacks" to when she had the aneurysm. *Id.* She testified that she has issues with her memory, and everything in her brain is "unorganized." *Id.* Plaintiff stated that she can keep track of her doctors' appointments if they call or text her, but she is unable to remember them on her own. Tr. 89. Plaintiff stated that she has to set a reminder to keep track of her medications. *Id.*

The ALJ resumed questioning of Plaintiff and asked her about how she spends a typical day. Tr. 91. Plaintiff testified that she does laundry and sometimes cooks for herself, but she stated that cooking is "not smart" because she often leaves the stove on. *Id.* When asked about cleaning her home, Plaintiff stated that it is "getting better." Tr. 92. Plaintiff stated that she loves to read and if it is a good book she can sit and read for "maybe a couple of hours." *Id.* Plaintiff noted that her eyes are getting worse even though she has prescription glasses. *Id.* Plaintiff did not allege issues with visual acuity but stated that her eyes were worse due to "old age." Tr. 93. Plaintiff indicated if she got stronger glasses, she would be able to read better. *Id.*

The ALJ noted that at Plaintiff's prior adjudication there were two positions identified of auto service advisor, Dictionary of Occupational Titles ("DOT") number 620.261-018, SVP 7, skilled; and mess hall corporate chief cook, DOT 315.361-010, SVP 6, skilled, medium. Tr. 94. The ALJ questioned Plaintiff regarding her job at the auto dealership where she worked as a service advisor. He noted, and Plaintiff confirmed, her duties of greeting customers, going over the car's issues, entering information into the computer, assigning the appropriate mechanic, and communicating with the parts and supplies people. Tr. 95. Plaintiff also confirmed that she would do customer follow-up and did training for the new service advisors. Tr. 96. Plaintiff stated that she also told the parts department what to order, she would call the manufacturers,

use a computer, prepare the sales reports, and assigned, but did not do the paperwork for, rental

cars. Tr. 96-97. Plaintiff confirmed that she also prepared reports, and attended sales meetings

with management, and became the service manager at Parts Automotive for about two years.

Tr. 97. She testified that as service manager, rather than service advisor, she was "in charge of

the service advisors and the technicians and the parts department." Tr. 98. Plaintiff testified that

at the military base she worked as the chief cook[7] and supervised employees. Tr. 98-99. She

stated that she worked in the "salad room" making salads, and she had to supervise the cooks in

the kitchen. Tr. 99. Plaintiff testified that she also did some training, prepared reports, and on

average lifted 50 pounds. Tr. 99-100. Plaintiff testified that as auto service advisor she

typically lifted about 20 pounds, and she lifted less as service manager. Tr. 100. She confirmed

that she occasionally would have to lift more. Tr. 101.

          2.      VE testimony

The VE identified Plaintiff's past work as auto service, DOT 620.261-018, SVP 7, light per

the DOT, medium as performed; service manager, DOT 185.67-058, SVP 6, light per the DOT,

light as performed; and DOT 313.131-014,[8] SVP 7, light per the DOT, medium as performed. Tr.

103. The ALJ asked the VE to assume an individual of the same age, education, and work

experience as Plaintiff, limited to work at the light exertional level with the following additional

limitations:

> [O]verhead reaching only as to the right would be occasional. All other
> reaching as to the right would be frequent. Climbing ramps and stairs would
> be occasional, never climbing ladders, ropes or scaffolds. Balance could be
> frequent but stooping, kneeling, crouching all would be occasional. I would
> say crawling would be never. The individual would never work on unprotected
> heights.

---

[7] In what appears to be a scrivener's error, the transcript identifies this job as "chief coach." Tr. 99. However, in her Disability Report, Plaintiff identified her job title as "chief cook." Tr. 456.

[8] The VE did not provide a job title; however, the DOT lists the title for this code as Chef (hotel & restaurant). *See* https://occupationalinfo.org/31/313131014.html (last visited Oct. 9, 2024).

Tr. 104. Plaintiff confirmed that she was not being treated for respiratory or breathing issues, and that there were no triggers for her headaches such as odors or fumes. *Id.* The ALJ added more limitations to his hypothetical to include that the individual would need to avoid concentrated exposure to tools or work processes that would expose them to vibration on a concentrated basis, and they would be "limited to a work environment in which the noise intensity level would not exceed a level 3 which is moderate . . . never unprotected heights, [and] avoid concentrated exposure to extreme cold[.]" Tr. 105. The ALJ noted that "any time off task could be accommodated through ordinary breaks." *Id.*

The ALJ asked the VE if Plaintiff could return to any of her past work. Tr. 105. The VE responded that the auto service advisor and chef would remain as generally performed per the DOT, but not as actually performed, but the service manager position would be eliminated. *Id.* The VE clarified that the service manager position would be eliminated because of noise intensity. Tr. 106. The VE testified that there would not be any skills transferable from past work to light work with those limitations due to the industry specific nature of the occupations. *Id.*

The ALJ asked the VE to consider the following modification:

[T]he individual would be limited to simple and routine tasks, but not at a production rate pace such as assembly line type work, would be limited to simple work related decisions regarding use of judgment, would be capable of occasional interaction with supervisors, occasional interaction with coworkers. I am going to say interaction with the public would be no greater than incidental and again just like use of judgment, would be limited to simple work related decisions. Time off task could be accommodated by ordinary breaks.

*Id.* The VE testified that past work is eliminated, but she identified examples of other jobs that could be performed, such as: garment sorter, DOT 222.687-014, SVP 2, light, 55,000 jobs in the national economy; checker I/clerical, DOT 222.687-010, SVP 2, light, 52,000 jobs in the national economy; and folder, DOT 369.687-018, SVP 2, light, 53,000 jobs in the national economy. Tr. 107. In response to a question from the ALJ, the VE testified that all PRW work

9

would be eliminated, but based on her professional experience the alternative positions could still be done if the hypothetical individual's maximum continued capability to stand and/or walk was reduced to four hours in an eight-hour day. *Id.* The VE further testified that if the capability to stand and/or walk was reduced to three hours in an eight-hour day the individual would be unemployable. Tr. 108.

The ALJ asked what the impact on the available jobs would be if the hypothetical individual "required a sit/stand option which would be a brief postural change at or near the workstation, no more … frequent than up to twice in an hour, duration of no greater than up to five minutes each." Tr. 108. The VE testified that the PRW would be eliminated, but the alternative jobs would remain. Tr. 108-09.

The ALJ asked the VE to consider the original hypothetical with no modifications other than the exertional level was reduced to sedentary. Tr. 109. The VE confirmed there would be no past work or transferable skills. *Id.* The ALJ asked if there would be work available at the sedentary level if he added mental health limitations of "similar team tasks but not a production rate pace, supervisor interaction occasional, coworker occasional, interaction with the public incidental, and simple work related decisions regarding use of judgment and dealing with change in the work setting." *Id.* The VE identified the following jobs: inspector, DOT 669.687-014, SVP 2, sedentary, 51,000 jobs in the national economy; final assembler, DOT 713.687-018, SVP 2, sedentary, 53,000 jobs in the national economy; and addressing clerk, DOT 209.587-010, SVP 2, sedentary, 50,000 jobs in the national economy. Tr. 109-10.

The ALJ asked if he changed the original hypothetical to sedentary with the limitation that "the individual's cumulative and consistent capability to stand and/or walk would not be greater than one hour in an eight hour day" would the three alternative positions be eliminated, and the VE responded affirmatively. Tr. 110. The ALJ asked if the available sedentary jobs

would still be available if he changed the original hypothetical to require a sit/stand option as previously identified, and the VE responded affirmatively. *Id.*

The ALJ asked at what percentage of time off task would result in the elimination of all work identified as well as all work in the national economy. Tr. 111. The VE testified that if off task exceeds ten percent throughout the work shift all jobs are eliminated. *Id.* The ALJ asked at what absenteeism rate on a monthly standard would result in the elimination of all work. *Id.* The VE testified that "[o]ne day per month is considered within normal limits. That includes arriving late, leaving the work shift early. If it exceeds one day per month or two days per month ongoing for six months it precludes all work." *Id.* The VE confirmed that all work in the national economy would be eliminated if there was a pattern of absenteeism of one day per month. Tr. 112.

The ALJ noted that the "DOT and its companion publications does not differentiate between overhead and directional reaching, one upper extremity versus the other, climbing ramps and stairs versus ladders, ropes or scaffolds. Does not address certain mental health limitations such as interaction and temperament in the workplace but does consider standards that are set on a scale, such as general education development, with mathematics, reasoning and language." Tr. 112. The VE confirmed that in her professional opinion jobs would be available and the alternative light and sedentary work would conform with the DOT with the mental health limitations. Tr. 112-13. The VE confirmed that her testimony regarding off task, sit/stand option, and variances from standing and/or walking was based on her training, education, and work experience, and the balance of her testimony was consistent with the DOT and its companion publications. Tr. 113-14.

The VE confirmed that all work in the national economy would be eliminated if the mental health functional capabilities of the hypothetical individual "would result in them having a

11

substantial loss in the ability to perform what might be even just one of the basic mental demands for unskilled work such as understanding, remembering and carrying out simple instructions, using judgment, responding appropriately to supervisors, coworkers, usually work situations, [or] responding to change in a routine wok setting." Tr. 114. The VE confirmed that all work identified, as well as all work in the national economy would be eliminated if the "hypothetical individual is incapable at any exertional level of performing work on a consistent basis eight hours a day, 40 hours a week or a similar work schedule[.]" *Id.* The VE confirmed that all her testimony for the hypotheticals "is actually conforming and consistent with the DOT and its companion publication, but also considers [her] training, [her] education and [her] work experience[.]" Tr. 115.

Plaintiff's counsel had no questions for the VE, and the hearing closed. Tr. 115-16.

II.     Discussion

    A.  The ALJ's Findings

In his May 8, 2023 decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.     It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits as set forth in section 202(e) of the Social Security Act.

3.     The prescribed period ends on September 30, 2027.

4.     The claimant has not engaged in substantial gainful activity since April 20, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

5.     Since the alleged onset date of disability, April 20, 2017, the claimant has had the following severe impairments: migraine, joint abnormality of the right shoulder, post-traumatic stress disorder (PTSD), persistent depressive disorder with dysthymic syndrome, generalized anxiety disorder, degenerative disc disease of the lumbar spine with left hip pain, degenerative disc disease of the cervical spine with prior ACDF at C6/7, and degenerative

joint disease of the right knee with numbness of the right lower extremity in the anterior thigh (20 CFR 404.1520(c) and 416.920(c)).

6. Since April 20, 2017, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

7. After careful consideration of the entire record, the undersigned finds that since April 20, 2017, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday; push and pull as much as she can lift and carry; occasionally reach overhead to the right; frequently perform all other directional reaching to the right; occasionally climb ramps and stairs; never climb ladder, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, and crouch; never crawl; never work at unprotected heights; must avoid concentrated exposure to extreme cold and to tools and work processes that would expose the claimant on a concentrated basis to vibration; limited to work where the noise intensity level does not exceed a level 3 (moderate); is able to perform simple, routine tasks but not at a production rate pace such as assembly line work; is able to use judgment to perform simple work-related decisions; occasionally interact with supervisors and coworkers; incidental interaction with the public; and able to deal with changes in the work setting to make simple work-related decisions.

8. Since April 20, 2017, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

9. Prior to the established disability onset date, the claimant was a younger individual age 18-49. On October 15, 2022, the claimant's age category changed to an individual of advanced age (20 CFR 404.1563 and 416.963).

10. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

11. Prior to October 15, 2022, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Beginning on October 15, 2022, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12. Prior to October 15, 2022, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the

national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

13.    Beginning on October 15, 2022, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

14.    The claimant was not disabled prior to October 15, 2022, but became disabled on that date and has continued to be disabled through the date of this decision. Her disability is expected to last twelve months past the onset date (20 CFR 404.1520(g) and 416.920(g)).

15.    The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2019, the date last insured (20 CFR 404.315(a) and 404.320(b)).

Tr. 20-22, 25, 33-35.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment;

(3) whether that impairment meets or equals an impairment included in the Listings;[9] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that the claimant can perform despite the existence of

---

[9] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.   The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . .." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir.

1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.    Analysis

Plaintiff asserts that the ALJ's residual functional capacity ("RFC") assessment failed to include "significant limitations" resulting from her impairments and failed to provide an adequate discussion rejecting those impairments.  Pl.'s Br. 1-2, ECF No. 10.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level, the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c). An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3) and (4). Social Security Ruling 96–8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184 at *7. The ALJ must discuss the claimant's ability to "perform sustained work activities in an ordinary work setting" on a regular work schedule. *Id.* Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

A.  The ALJ's RFC Assessment

Plaintiff argues that "in support of the RFC the ALJ accepted most of the reconsideration state agency examiners' opinions, finding them 'partially persuasive.'" Pl.'s Br. 18. Plaintiff

contends the "ALJ failed to reconcile pertinent portions of these opinions[,] specifically the opinions regarding Plaintiff's ability to handle detailed tasks. *Id.* The Commissioner argues that the ALJ "gave regulation-based reasons—supported by substantial evidence—for why he found Dr. Ward's findings only partially persuasive." Def.'s Br. 7, ECF No. 11.

Here, the ALJ determined Plaintiff had the RFC for light work with additional limitations that including limiting her to the ability to "perform simple, routine tasks but not at a production rate pace such as assembly line work; [the ability] to use judgment to perform simple work-related decisions; occasionally interact with supervisors and coworkers; incidental interaction with the public; and able to deal with changes in the work setting to make simple work-related decisions." Tr. 25. In making this determination, the ALJ considered the evidence of record, including the opinions of consultative examiners and State agency non-examining physicians. Tr. 30-32. The ALJ cited to the February 2019 consultative examination by Dr. Spivey who "concluded that the claimant would be capable of understanding simple instructions and performing simple tasks in the workplace but would have difficulty understanding complex instructions and performing complex tasks." Tr. 30. The ALJ found this opinion "generally persuasive," noting that the "assessed limitations regarding performance of simple tasks as well as stamina and persistence are generally consistent with the record as a whole, including portions of the opinions of Dr. Steele, Dr. Whitley, and the State Agency psychological consultants on reconsideration." *Id.* The ALJ considered the July 2020 consultative psychological evaluation of Dr. Steele finding it "minimally persuasive because it is based on a single examination of the claimant; and, more significantly, not generally consistent with the other medical evidence of record." *Id.* The ALJ noted that "the only limitation assessed by Dr. Steele is a speculative difficulty in concentration." *Id.* The ALJ found that "clinical findings of reduced energy level by Dr. Spivey and mild depression noted by Dr. Whitley support the conclusion that the claimant's depression and anxiety symptoms generally limit her to simple

tasks, simple decisions, and work that is not at a production rate pace." *Id.* The ALJ cited to Dr. Whitley's July 2021 consultative psychological exam, which the ALJ found generally persuasive, and Dr. Whitley's conclusion that "claimant was able to understand, follow, and process simple instructions [and] could navigate 2- to 3-step instructions as well in a low stress and low demand work environment." Tr. 30-31.

The ALJ discussed the opinions of the State agency medical and psychological consultants and determined that the opinions on initial review were not persuasive. Tr. 32. As to the findings of the psychological consultants on reconsideration, the ALJ found them "partially persuasive." *Id.* This included the psychologist's opinion that "claimant was able to understand and remember simple instructions but could not understand and remember detailed instructions; was able to attend to and perform simple, unskilled tasks; was able to maintain concentration and attention for periods of at least 2 hours; was able to respond appropriately to supervision, co-workers and the public; was able to be aware of normal hazards and take appropriate precautions, use judgment to make simple work-related decisions, and respond appropriately to changes in a routine work setting (Exhibits B7A and B8A)." Tr. 32. The ALJ determined that the assessed limitations "are generally well supported and consistent with the record as a whole, [but] the consultants did not adequately consider the combination of the claimant's impairments. Further, they did not have the opportunity to review evidence received at the hearing level." *Id.* The ALJ found based on Plaintiff's testimony she had "more restrictive postural limitations and that she has some social limitations, as discussed in more detail above." *Id.*

Plaintiff argues that while the ALJ seems to accept the limitations to simple tasks and simple work-related decisions, the jobs identified by the VE have a GED reasoning level of 2, which "requires the ability to understand and carry out detailed, but uninvolved written or oral instructions." Pl.'s Br. 19. The Commissioner argues that there is no conflict between the ALJ's

RFC assessment and with the jobs identified in Step Five of the ALJ's decision. Def.'s Br. 11. The Commissioner points out that the ALJ limited Plaintiff to simple, routine tasks which caselaw in this Circuit has found consistent with GED reasoning level two jobs. *Id.* at 12. On Reply, Plaintiff argues that "nowhere in the ALJ's decision does the ALJ explain how he arrived at simple, routine tasks, R 25, over the ability to perform simple instructions but could not understand and remember detailed instructions." Pl.'s Reply 2, ECF No. 12.

In addition to general descriptions of the work to be performed, the DOT job descriptions also include a "definition trailer" that indicates among other things the strength rating for the job, the specific vocational preparation needed, and the general educational development ("GED") required for satisfactory job performance. Appendix C – Components of the Definition Trailer, 1991 WL 688702. A GED reasoning level of two provides that the worker should be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." *Id.* GED reasoning level one provides that the worker should "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.*

Here, the ALJ found Plaintiff capable of performing simple, routine tasks and making simple work-related decisions. Tr. 25. The ALJ's RFC assessment did not discuss Plaintiff's ability to follow instructions, despite finding persuasive the opinions of consultants who limited Plaintiff to "understanding simple instructions," Tr. 30, finding she "was able to understand, follow, and process simple instructions [and] could navigate 2- to 3-step instructions as well in a low stress and low demand work environment," Tr. 30-31, and finding she was "able to understand and remember simple instructions but could not understand and remember detailed instructions," Tr. 32. Based on the conflict between the DOT's GED reasoning levels on instructions for the identified jobs, and the

ALJ's failure to address Plaintiff's ability regarding instructions, the undersigned cannot find that substantial evidence supports the ALJ's decision. The undersigned notes the case cited by Plaintiff in her Response Brief that is directly on point with the issues in this case, and the undersigned agrees with the finding in that case to which the Commissioner did not object. *See* Pl.'s Reply 6. In *Lewis v. Saul*, the court noted:

> But while [the State agency] experts also found Plaintiff could "understand, retain, and follow simple instructions," the Magistrate Judge observed "[t]he ALJ included no provision in the RFC assessment as to the type of instructions Plaintiff could understand and remember[.]" (*Id.* at 36-37.) The Magistrate Judge further explained this omission was not harmless because, assuming the ALJ meant to limit Plaintiff to simple instructions, the ALJ nonetheless "rel[ied] on jobs that an individual limited to short and simple instructions might not be able to perform." (*Id.* at 37.) Thus, the Magistrate Judge continued, "if the ALJ accepted [the two expert] ... opinion[s] that Plaintiff was limited to short and simple instructions, he would have been required to resolve the apparent conflict between the DOT and the VE's identification of jobs with GED reasoning levels of two and three in order to support the Commissioner's burden at step five." (*Id.* at 39.) And although the Magistrate Judge agreed with the Commissioner that the ALJ was not required to adopt every finding of the experts to whom he afforded considerable weight, the Magistrate Judge stressed that "[a] review of the ALJ's decision as a whole reflects *no* consideration as to the type of instructions that Plaintiff required." (*Id.* at 39-40 (emphasis added).) At bottom, the Magistrate Judge concluded remand was necessary because "[i]f [the ALJ] intended to restrict Plaintiff to short and simple instructions, his step five finding is not supported by substantial evidence. If he did not intend to limit Plaintiff to short and simple instructions, he has not resolved the evidence that is contrary to such a conclusion and explained his reasoning in accordance with the pertinent regulations[.]" (*Id.* at 40-41.)

*Lewis v. Saul*, No. 1:19-CV-03457-JMC, 2021 WL 1961010, at *1 (D.S.C. May 17, 2021).

In light of the foregoing, the undersigned finds the ALJ failed to resolve the conflict in the DOT related to the GED reasoning level for the identified positions and his RFC assessment. Accordingly, the undersigned recommends remand for further administrative proceedings.

IV.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the ALJ's RFC assessment and Step Five finding are

based on substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings as discussed within.

IT IS SO RECOMMENDED.

October 15, 2024                          Kaymani D. West
Florence, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**